# In the United States Court of Federal Claims

**No. 21-1143C**
**Filed: October 30, 2021**

```
* * * * * * * * * * * * * * * * * *   *
                                      *
CORINTHIA J. ALEXANDER, et al.,       *
                                      *
              Plaintiffs,             *
                                      *
v.                                    *
                                      *
UNITED STATES,                        *
                                      *
              Defendant.              *
                                      *
                                      *
* * * * * * * * * * * * * * * * * *   *
```

    **Molly A. Elkin**, Law Offices of McGillivary Steele Elkin LLP**,** Washington, D.C., for plaintiffs. With her was **Sarah M. Block**, Law Offices of McGillivary Steele Elkin LLP, Washington, D.C.

    **Bret R. Vallacher**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Reginald T. Blades Jr.**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey Jr.**, Acting Director, Commercial Litigation Branch, and **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division. **Ted Booth**, Assistant General Counsel, Federal Bureau of Prisons, of counsel.

# O P I N I O N

<u>**HORN, J.**</u>

    The above captioned case was filed by 334 current or former employees at the Federal Correction Complex Beaumont (the Beaumont Institution) located in Beaumont, Texas. In plaintiffs' complaint, they allege they are bringing this action on behalf of themselves and other employees similarly situated for back pay, and other relief pursuant to 29 U.S.C. § 216(b) (2018), 29 U.S.C. § 1331 (2018), 28 U.S.C. § 1346(a)(2) (2018), 28 U.S.C. § 1491 (2018), 5 U.S.C. § 5596 (2018), and the overtime provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207 (2018). In the United States Court of Federal Claims, plaintiffs filed an initial complaint on March 31, 2021 and then, on April 20, 2021, an amended complaint. After defendant filed a motion to dismiss on June 15, 2021, plaintiffs filed a second amended complaint on June 23, 2021. The second amended complaint alleges, "[p]laintiffs and other employees similarly situated have been entitled to FLSA overtime pay for all hours of work in excess of eight (8) in a day and/or

forty (40) in a workweek." Plaintiffs claim "[d]efendant has suffered or permitted Plaintiffs to work at least 15-30 minutes each shift, and sometimes more, before and after their scheduled shift times without compensating Plaintiffs for this work time." Plaintiffs assert that in addition to their regular, compensated work time, they were each required to go through security screening, collect and don their belts and other required equipment, flip their accountability chit,[1] clear the sally port,[2] perform an equipment and information exchange, and walk to and from their assigned duty posts prior to and after their eight-hour shifts. As relief, plaintiffs request the court:

> (a) Enter judgment declaring that Defendant has willfully and wrongfully violated its statutory obligations, and deprived each Plaintiff of their rights under the FLSA and Title 5;

> (b) Award each Plaintiff monetary damages, including backpay and liquidated damages equal to their unpaid compensation, plus interest;

> (c) Award Plaintiffs their reasonable attorneys' fees to be paid by Defendant, and the costs and disbursements of this action; and

> (d) Grant such other relief as may be just and proper.

(capitalization in original).

According to plaintiffs' second amended complaint, the Beaumont Institution is a federal correctional complex with three component facilities: FCI Beaumont Low, a low security correctional facility; FCI Beaumont Medium, a medium security correctional facility; and a United States Penitentiary Beaumont, a high security penitentiary. The three facilities in this lawsuit house over 4,300 inmates, including those who are violent offenders.

Also, according to plaintiffs' second amended complaint, "[t]he Institution . . . is staffed 24 hours per day, 365 days per year, by correctional officers, including Plaintiffs. The correctional officers' principal activity is maintaining the safety and security of the Institution, inmates, and staff." According to the second amended complaint, most of the posts to which plaintiffs are assigned are staffed for 16 or 24 hours per day. Some 24-hour posts are staffed with "three 8-hour paid shifts daily, often referred to as Morning

---

[1] Chits are typically small pieces of plastic or metal that are commonly used in penal institutions to identify employees either by name or number. See Aguilar v. Mgt. & Training Corp., 948 F.3d 1270, 1282 (10th Cir. 2020) (defining chits as "individualized metal coins . . . that record who possesses the equipment."); Carlsen v. United States, 72 Fed. Cl. 782, 789 n.20 (2006), aff'd, 521 F.3d 1371 (Fed. Cir.), as corrected on reh'g (Fed. Cir. 2008).

[2] Sally ports are typically comprised of "a set of double electronically-controlled doors . . . . An officer in a control booth controls entry and exit to the sally port. Only one door to the sally port can be open at a time." Bishop v. United States, 74 Fed. Cl. 144, 147 (2006), aff'd sub nom. Carlsen v. United States, 521 F.3d 1371 (Fed. Cir.), as corrected on reh'g (Fed. Cir. 2008).

Watch, Day Watch and Evening Watch." Further, according to plaintiffs, "[b]ecause the Institution has implemented a Compressed Work Schedule option, some 24-hour Housing Unit posts are staffed with two shifts of 12 hours, instead of three shifts of 8 hours." When there is a 24-hour post, for both 12-hour and 8-hour shifts, there is no paid overlap of guards. By contrast, "there has been a 15-minute scheduled, paid overlap between the two 8 hour shifts on 16-hour posts in the Institution since at least 2014."

Plaintiffs allege that before walking to their assigned posts at any of the three component sections in the Beaumont Institution, plaintiffs must clear the staff security screening in order to "perform their principal activity of maintaining safety and security by assuring that no contraband enters the Institution." On arrival, "[p]laintiffs assigned to a 24-hour post at any of the three facilities within Institution begin their unpaid pre-shift work when they start the process of clearing the staff screening site in the front lobby" of their assigned component section within the Beaumont Institution. After the security screening, plaintiffs "collect and don their duty belts and other required equipment after clearing the staff screening site, including required metal chains and chits, which are essential to hold keys and access equipment." Plaintiffs collect their equipment after clearing the screening "because Plaintiffs cannot wear their duty belts and metal chains as they walk through the upright metal detector without sounding the alarm."

Next, according to plaintiffs, they are visually identified by the Control Center officer in whichever facility within the Beaumont Institution they are assigned. This officer allows plaintiffs to enter "into a sally port, where they are required to flip their accountability chit signifying that they are on duty and inside the secured confines of the Institution." Also according to the second amended complaint, after clearing the sally port, plaintiffs walk

> to their 24-hour posts inside the secure confines of the Institution. While walking to their posts, Plaintiffs supervise and monitor inmates, observe and correct inmate behavior, respond to inmate questions, check for security breaches in the perimeter fence and elsewhere inside the Institution, check for contraband, run to locations where body alarms sound, and respond to other emergencies as they arise.

Once they arrive at their assigned posts, plaintiffs "exchange equipment—including but not limited to radios, oleoresin capsicum ('OC') spray and keys—with the outgoing correctional officer assigned to that post. Plaintiffs also perform a vital (but unpaid) information exchange with the outgoing correctional officer about any significant security events that occurred the previous shift." Plaintiffs claim that their pre-shift preparations should be compensable time. After performing their paid shift, plaintiffs walk "from their posts to exit the secured perimeter" doing an uncompensated post-shift activity, during which they

> are required to, and do, respond to emergencies, including violent fights between inmates, within the Institution on unpaid time when such emergencies occur while they are walking to their posts prior to their shifts, or while they are walking from their posts back to the Control Center after their shifts. Failure to respond to an emergency results in discipline up to and including termination.

3

Plaintiffs claim all these pre and post-shift activities also should be compensated.

Plaintiffs allege "[d]efendant has suffered or permitted Plaintiffs to work at least 15-30 minutes each shift, and sometimes more, before and after their scheduled shift times without compensating Plaintiffs for this work time." Plaintiffs allege that the pre- and post-shift activities previously described are work activities as specified by the FLSA, which entitle plaintiffs "to overtime compensation at a rate of not less than one and one-half times their regular rate of pay for all the hours or work in excess or 8 hours in a work day and/or in excess of 40 in a workweek." As indicated above, plaintiffs allege, "[p]ursuant to 29 U.S.C. § 216(b), Plaintiffs are entitled to recover backpay and liquidated damages in an amount equal to their backpay for Defendant's failure to pay overtime compensation in compliance with the FLSA." Additionally, plaintiffs argue, "[p]ursuant to the Back Pay Act, 5 U.S.C. § 5596, Plaintiffs are entitled to recover interest on their backpay damages for Defendant's failure to pay them overtime compensation." Moreover, plaintiffs argue that they "are entitled to recover attorneys' fees and costs under 29 U.S.C. § 216(b), the Back Pay Act, 5 U.S.C. § 5596, as well as other applicable laws and regulations."

Defendant responded to plaintiffs' amended complaint by filing a motion to dismiss and asserting that plaintiffs have failed to state a claim because

> plaintiffs have not plausibly alleged that any of these preliminary and postliminary activities are both "integral and indispensable" to the work that they are "employed to perform," *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 32–33 (2014) (citing 29 U.S.C. § 254(a)), and exceed the 10-minute *de minimis* threshold, *Carlsen v. United States*, 72 Fed. Cl. 782, 798 (2006) ("the agency is not obligated to pay overtime when this work takes ten minutes or less"), *aff'd*, 521 F.3d 1371 (Fed. Cir. 2008), *as corrected on reh'g* (Apr. 29, 2008).

Defendant contends that plaintiffs' alleged principal activity of "'maintaining the safety and security of the Institution, inmates, and staff'" are "'conclusory statements of law and fact,'" which "'must be supported by factual allegations.'"" (quoting Shell Oil Col. v. United States, 148 Fed. Cl. 781, 788 (2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). Moreover, defendant asserts that plaintiffs' allegations fail "to establish a 'principal activity' as a matter of law because 'safety and security' are not specific activities—much less 'principal activities,' as required." In its motion to dismiss, defendant states that the court should analyze whether each of the plaintiffs' claimed "pre- and post-shift activities is necessary to the principal *activity* plaintiffs are paid to do, *i.e.*, supervising inmates and addressing any issues they see." (emphasis in original).

### D I S C U S S I O N

Regarding defendant's fully briefed motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) (2021) of the Rules of the United States Court of Federal Claims (RCFC), when examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2021); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570); First Mortg. Corp. v. United States, 961 F.3d 1331, 1339 (Fed. Cir. 2020); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380 (Fed. Cir. 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly,

550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726–27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Am. Bankers Ass'n v. United States, 932 F.3d at 1380 ("In reviewing a motion to dismiss, we accept as true the complaint's well-pled factual allegations; however, we are not required to accept the asserted legal conclusions." (citing Ashcroft v. Iqbal, 556 U.S. at 678)); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

As indicated above, plaintiffs' second amended complaint alleges that the government failed "to properly compensate employees for the entire continuous workday," as required by the FLSA and 5 C.F.R. § 551.501 (2021). Plaintiffs argue that "[p]laintiffs and other employees similarly situated have been entitled to FLSA overtime pay for all hours of work in excess of eight (8) in a day and/or forty (40) in a workweek," citing to 29 U.S.C. § 207(a) of the FLSA; and 5 C.F.R. § 551.501. Section 7(a)(1) of the FLSA, states:

> (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he [or she] is employed.

29 U.S.C. § 207(a)(1). The regulation at 5 C.F.R. § 551.501 incorporates the FLSA's direction for how to calculate federal employees' overtime compensation, stating: "An agency shall compensate an employee for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and one-half times the employee's hourly regular rate of pay," with limited, articulated exceptions. 5 C.F.R. § 551.501. Plaintiffs argue that their pre-and post-shift activities, which include security screening, collecting and donning security equipment, entering the sally port and flipping their accountability chits, walking to their assigned posts, performing an equipment and information exchange at their assigned posts, and walking to the exit of the Beaumont Institution, constitute work for which they are not, but should be compensated. Defendant does not dispute that plaintiffs are conducting the activities plaintiffs allege occur, nor does defendant deny that plaintiffs are not being compensated for those activities. Instead, defendant argues that such activities are not compensable because "plaintiffs fail to plausibly allege that any of these activities are both an intrinsic element of their principal activities and take more than a *de minimis* amount of time."

## The Fair Labor Standards Act and the Portal-to-Portal Act

The FLSA does not define what constitutes work under the statute as applicable to the case currently under review. See Tenn. Coal, Iron & R. Co. v. Muscoda Loc. No. 123, 321 U.S. 590, 597 (1944) ("[W]e are not guided by any precise statutory definition of work or employment. Section 7(a) [of the FLSA] merely provides that no one, who is engaged in commerce or in the production of goods for commerce, shall be employed for a workweek longer than the prescribed hours unless compensation is paid for the excess hours at a rate not less than one and one-half times the regular rate.") (alteration added). The regulation at 29 C.F.R. § 785.6 (2020) also states, "[t]he [FLSA], however, contains no definition of 'work.' Section 3(o) of the [FLSA] contains a partial definition of 'hours worked' in the form of a limited exception for clothes–changing and wash–up time." 9 C.F.R. § 785.6. The regulations do contain some examples of what does and what does not constitute work. The regulation at 29 C.F.R. § 785.11 (2020) states:

> For example, an employee may voluntarily continue to work at the end of the shift. He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason to believe that he is continuing to work and the time is working time.

In general terms, the United States Supreme Court has interpreted the FLSA and "defined 'work' as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'" Integrity Staffing Sols., Inc. v. Busk, 574 U.S. at 31 (quoting Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. at 598). The Supreme Court "defined 'the statutory workweek' to 'includ[e] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.'" Id. (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 690–91 (1946)).

After the Supreme Court in <u>Anderson</u> and <u>Tennessee Coal</u> "found compensable the time spent traveling between mine portals and underground work areas" as well as "the time spent walking from timeclocks to work benches," the decisions "provoked a flood of litigation." <u>Integrity Staffing Sols., Inc. v. Busk</u>, 574 U.S. at 31 (citing <u>Anderson v. Mt. Clemens Pottery Co</u>., 328 U.S. at 690–91; and <u>Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123</u>, 321 U.S. at 598). Following <u>Anderson</u>, "unions and employees filed more than 1,500 lawsuits under the FLSA," which sought "nearly $6 billion in back pay and liquidated damages for various preshift and postshift activities." <u>Id.</u> at 31–32 (citing S. Rep. No. 37, at 2–3 (1947)). As noted by the Supreme Court in <u>Integrity Staffing</u>, Congress found these expansive definitions of "work" problematic. <u>See id.</u> at 32 (quoting 29 U.S.C § 251 (2012)) ("[The FLSA] has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers.").

Congress, concerned that the decisions in <u>Anderson</u> and <u>Tennessee Coal</u> created "wholly unexpected liabilities, immense in amount and retroactive in operation," that "would bring about financial ruin of many employers and seriously impair the capital resources of many others, thereby resulting in the reduction of industrial operations, halting of expansion and development, curtailing employment, and the earning power of employees," 29 U.S.C. § 251(a), sought to narrow the definition of "work" within the FLSA, in 1947, with the Portal-to-Portal Act, 29 U.S.C §§ 251–62 (1947), which exempted employers from "liability or punishment under the [FLSA]" for certain activities. <u>See</u> 29 U.S.C. §§ 251–62; <u>see also</u> <u>Integrity Staffing Sols., Inc. v. Busk</u>, 574 U.S. at 32 (stating that Congress found that the FLSA had been interpreted too broadly and passed the Portal-to-Portal Act to narrow the scope of what constitutes compensable work).

The Portal-to-Portal Act states, at 29 U.S.C. § 254, now states:

(a) no employer shall be subject to any liability or punishment under the Fair Labor Standards Act, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947—

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C § 254 (2018).

Thereafter, the Department of Labor (DoL) issued the "continuous-workday" rule, which interprets the Portal-to-Portal Act, and which states, "[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted." 29 C.F.R. § 790.6(a) (2020). In other words, "[o]nce the work day starts, all activity is ordinarily compensable until the work day ends." Castaneda v. JBS USA, LLC, 819 F.3d 1237, 1243 (10th Cir. 2016); see also Aguilar v. Mgt. & Training Corp., 948 F.3d at 1279 (finding that for detention officers, an initial security screening was integral and indispensable to their principal activities and, therefore, started their workday). In the case currently before the court, plaintiffs claim that upon entering the security screening, their workday begins, and every activity thereafter should be compensable. Defendant alleges, however, that "plaintiffs have not plausibly alleged that any of these preliminary and postliminary activities are both 'integral and indispensable' to the work that they are 'employed to perform,'" and are not compensable. See Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 32–33. The issues before this court, therefore, are what defines plaintiffs' "principal activity or activities" and which activities are, as alleged by plaintiffs, compensable because they are "integral and indispensable" to the performance of plaintiffs' principal activities.

The Supreme Court in Integrity Staffing wrote that "an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id. at 37. In Integrity Staffing, warehouse workers brought suit for back pay, claiming that the time that employees spent waiting to undergo and going through an antitheft security screening before leaving the warehouse was compensable. See id. at 29. The Supreme Court in Integrity Staffing concluded that "[b]ecause the employees' time spent waiting to undergo and undergoing Integrity Staffing's security screenings does not meet these criteria, we reverse the judgment of the Court of Appeals," and held that those activities were not compensable. Id. In a concurrence to the majority's decision in Integrity Staffing, Justice Sotomayor clarified that "an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively." Id. at 38–39 (Sotomayor, J., concurring). Justice Sotomayor continued that "although a battery plant worker might, for example, perform his principal activities without donning proper protective gear, he could not do so safely; likewise, a butcher might be able to cut meat without having sharpened his knives, but he could not do so effectively." Id. at 38 (internal citations omitted) (citing Mitchell v. King Packing Co., 350 U.S. 260, 262–63 (1956); Steiner v. Mitchell, 350 U.S. 247, 250–53 (1956); 29 C.F.R. § 790.8(c) (2013)).

Furthermore, the Supreme Court stated that "[t]he word 'integral' means '[b]elonging to or making up an integral whole; constituent, component; *spec[ifically]* necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage.'" Id. at 33 (alterations and emphasis in original) (quoting 5 Oxford English Dictionary 366 (1933)). The word

"'indispensable' means a duty '[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected.'" Id. (quoting 5 Oxford English Dictionary 219 (1933)). "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id. As discussed below, however, the Supreme Court has questioned over broad definitions of what qualifies as an employee's principal activities. See IBP, Inc. v. Alvarez, 546 U.S. 21, 40–41 (2005) (citing Steiner v. Mitchell, 350 U.S. at 247) ("[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under Steiner.").

In their second amended complaint, plaintiffs characterize their principal activities as "maintaining safety and security of staff, inmates, and the Institution." Plaintiffs' second amended complaint also states that their principal activities include "supervising and monitoring inmates and maintaining safety and security." As stated above, defendant argues that plaintiffs failed to state a claim because the claim "fails to establish a 'principal activity' as a matter of law because 'safety and security' are not specific activities—much less 'principal activities,' as required." Defendant argues that "the Court should instead consider the alleged *activities* through which plaintiffs pursue their goal of 'safety and security.'" (emphasis in original). Defendant asserts:

> Plaintiffs allegedly pursue "safety and security" by "maintaining constant vigilance" for "contraband" and events "out of the ordinary," and by "addressing any issues that they see." With this framework in mind, we address whether plaintiffs have plausibly alleged that each of the pre- and post-shift activities is necessary to the principal *activity* plaintiffs are paid to do, *i.e.*, supervising inmates and addressing any issues they see.

(emphasis in original).

Defendant appears to assert that plaintiffs' "generalized goal" of "maintain[ing] safety and security of the Institution, inmates, and staff" and "supervising and monitoring safety and security" are not specific or descriptive enough as plaintiffs' principal activities to defeat a motion to dismiss; the court disagrees. The principal duties of prison guards at a penal institution are directed exactly towards maintaining safety and security of the facility, staff, and inmates in the Beaumont Institution, without which all parts of the Beaumont Institution could not function. Moreover, defendant's statement of plaintiffs' duties as "supervising inmates and addressing any issues that they see" appears to amount to essentially the same as plaintiffs' definitions of their principal duties of "maintaining constant vigilance to ensure that nothing out of the ordinary is occurring, immediately addressing any issues they see," "maintaining safety and security of staff, inmates, and the Institution," as well as "supervising and monitoring inmates."

As to plaintiffs' claims regarding overtime pay for time alleged as compensable before and after arriving at their assigned posts, the United States Court of Appeals for the Federal Circuit has explained, "[t]he more the preliminary (or postliminary) activity is

undertaken for the employer's benefit, the more indispensable it is to the primary goal of the employee's work, and the less choice the employee has in the matter, the more likely such work will be found to be compensable." <u>Bobo v. United States</u>, 136 F.3d 1465, 1467 (Fed. Cir. 1998) (internal quotation marks omitted) (quoting <u>Reich v. New York City Transit Auth.</u>, 45 F.3d 646, 650 (2d Cir. 1995)).

Plaintiffs argue that "[a]ll of Plaintiffs' pre-shift and post-shift tasks are intimately connected to and are absolutely required for Plaintiffs to safely perform their job duties to ensure they can maintain safety and security inside the Institution and go home in one piece at the end of the workday." According to plaintiffs, "multiple courts have held these same tasks [as those alleged in this case] performed by correctional workers in a prison setting constitute compensable work under the FLSA." Plaintiffs rely on <u>Aguilar v. Management & Training Corp.</u>, in which 122 correctional officers claimed they were not paid for certain pre- and post-shift activities that should have been compensable under the FLSA. <u>See</u> <u>Aguilar v. Mgt. & Training Corp.</u>, 948 F.3d at 1274. In <u>Aguilar</u>, the United States Court of Appeals for the Tenth Circuit found that "undergoing the security screening, receiving the preshift briefing, picking up and returning keys and equipment, and walking to and from post—are integral and indispensable to the officers' principal activities." <u>Id.</u> at 1277. Key to the Tenth Circuit's reasoning was that the pre- and post-shift activities are "tied to the productive work that the employee is *employed to perform*." <u>Id.</u> (emphasis in original) (quoting <u>Integrity Staffing Sols., Inc. v. Busk</u>, 574 U.S. at 36). The Tenth Circuit further noted that the activities must "share the same purpose." <u>Aguilar v. Mgt. & Training Corp.</u>, 948 F.3d at 1278. Plaintiffs also cited <u>Roberts v. State</u>, 483 P.3d 212 (Ariz. App. 1st Div. 2021), which stated "[i]n considering whether the security screenings are integral to the Officers' principal activities, we are persuaded by <u>Aguilar v. Mgt. & Training Corp.</u>, 948 F.3d 1270 (10th Cir. 2020), which held that the time corrections officers spent undergoing pre-shift security screenings was compensable." <u>Roberts v. State</u>, 483 P.3d at 220.

Defendant points out that not all courts have agreed with the Tenth Circuit's view on whether these pre- and post-shift activities are indispensable to a detention officers' principal activities. For example, defendant cites to <u>Hootselle v. Missouri Department of Corrections</u>, 624 S.W.3d 123 (Mo. 2021), in which the Missouri Supreme Court held that the time that corrections officers spent going through security screenings and receiving assignments was not "integral to supervising, guarding, escorting, or disciplining offenders."[3] <u>Id.</u> at 140. The <u>Hootselle</u> court noted that the Tenth Circuit in <u>Aguilar v. Management & Training Corp.</u>, 948 F.3d 1270, "found submitting to a correctional facility's security procedures was integral and indispensable to the officers' principal activities of maintaining custody and discipline of inmates and providing security, in part, because the screenings and the principal activities shared the same goals of providing prison security." <u>Hootselle v. Mo. Dep't of Corrections</u>, 624 S.W.3d at 140. The <u>Hootselle</u> court disagreed with this approach, stating that the Tenth Circuit subtly expanded "the test formulated in

_____

[3] The <u>Hootselle</u> court did, however, find that the time that the corrections officers spent picking up and returning equipment as well as the time spent walking to and away from the officers' assigned posts while on duty were principal activities which were compensable. <u>See</u> <u>Hootselle v. Mo. Dep't of Corrections</u>, 624 S.W.3d at 140–42.

*Busk*, and *Aguilar* cites no authority for the proposition that an activity may be integral if it shares a common goal with the work." Id. (citing Integrity Staffing Sols., Inc. v. Busk, 574 U.S. at 36; and Aguilar v. Mgt. & Training Corp., 948 F.3d at 1270). Moreover, the Hootselle court stated that following the example of Aguilar "would likely result in the very issue the Portal-to-Portal Act was passed to address – unexpected liabilities due to an overly broad definition of compensable work." Hootselle v. Mo. Dep't of Corrections, 624 S.W.3d at 140. Defendant also cites to an unreported United States District Court for the Northern District of Ohio case, Henderson v. Cuyahoga County, which granted a motion to dismiss in an FLSA case brought by correctional officers who sought compensation for time spent going through a pre-shift security screening, because going through such screenings was "akin to checking in and out and waiting in line to do so—activities that Congress clearly deemed to be preliminary or postliminary." Henderson v. Cuyahoga Cnty., No. 1:20 CV 1351, 2020 WL 5706415, at *3 (N.D. Ohio Sept. 24, 2020) (quoting Integrity Staffing Sols., Inc. v. Busk, 574 U.S. at 37) (Sotomayor, J., concurring) (citing S. Rep. No. 48, at 47 (1947); 29 C.F.R. § 790.7(g) (2013)).

From the relevant statutes, regulations, and the different caselaw interpretations, the court concludes that defining which activities are "integral and indispensable" or "intrinsic" to a "principal activity" for FLSA purposes is a fact specific inquiry. See, e.g., Integrity Staffing Sols., Inc. v. Busk, 574 U.S. at 37 (conducting a fact specific analysis before concluding that the time spent waiting to undergo a security screening was not "integral and indispensable" to the duties of the warehouse workers); Aguilar v. Mgt. & Training Corp., 948 F.3d at 1289 (in which the court conducted a fact intensive inquiry before deciding that the time spent by detention officers going through a security screening was "integral and indispensable" to their principal activities, and that it should be compensable under the FLSA); Llorca v. Sheriff, Collier Cnty., Fla., 893 F.3d 1319, 1324 (11th Cir. 2018) ("The inquiry is fact-intensive and not amenable to bright-line rules. Nevertheless, whether a particular set of facts and circumstances is compensable under the FLSA is a question of law for the Court to decide."); Astor v. United States, 79 Fed. Cl. 303, 312 (2007) ("[A]n employee's primary duty characterization remains a case-by-case determination."); Hootselle v. Mo. Dep't of Corrections, 624 S.W.3d at 137 (citing Llorca v. Sheriff, Collier Cnty. Fla., 893 F.3d at 1324) (stating that determining whether an activity is integral and indispensable to the work that corrections officers are employed to do requires a fact-intensive inquiry); 29 C.F.R. § 790.7(h) (2020) (providing that the circumstances may determine if a preliminary or postliminary activity is compensable).

Plaintiffs identify six different pre- and post-shift activities they allege are integral and indispensable to their principal activities and for which they are not being compensated, but should be: (1) a security screening, (2) collecting and donning security equipment, (3) entering the sally port and flipping their accountability chit, (4) walking to their assigned post, (5) equipment and information exchange at the assigned post, and (6) responding while walking from their assigned post to the exit of the Beaumont Institution.

**(1) Security Screening**

The first pre-work activity for which plaintiffs claim they should be compensated is the security screening at the entrance to the Beaumont Institution, where plaintiffs claim to "perform their principal activity of maintaining safety and security by assuring that no contraband enters the Institution." Plaintiffs state that

> [c]learing the security screening site is integral and indispensable to Plaintiffs' principal activity of maintaining safety and security of staff, inmates, and the Institution, because it is intrinsic to that principal activity and one with which they cannot dispense if they are to safely perform their job duties as correctional officers in the dangerous prison environment.

Defendant argues that plaintiffs offer a "conflation of 'principal activities' with abstract general purposes." As indicated above, defendant argues that "safety and security" is merely a goal, for which plaintiffs' principal activities are "the alleged *activities* through which plaintiffs pursue their goal of 'safety and security.'" (emphasis in original). The court finds defendant's arguments as to the inadequacies of plaintiffs' stated definition of their principal activities unpersuasive. Plaintiffs stated that their principal activities are "maintaining safety and security of the Institution, the inmates, and staff," and "supervising and monitoring inmates and maintaining safety and security" at a prison facility, which, albeit articulated in different words, is essentially synonymous with defendant's statement of plaintiffs' duties of "supervising inmates and addressing any issues that they see." In the case currently before the court, regarding the security screening that plaintiffs undergo, plaintiffs allege claims which are sufficient to defeat a motion to dismiss when the six specific activities for which plaintiffs claim compensation is due are taken in the context of the security duties the prison guards are assigned during their shifts. Although the Supreme Court in <u>Integrity Staffing Solutions, Inc. v. Busk</u> indicated security screenings for warehouse workers who packed products for shipment were not integral and indispensable to their duties as warehouse workers, there is a clear distinction between what is integral and indispensable for warehouse workers, and what is integral and indispensable for prison guards, for whom activities related to the safety of the inmates and staff depend, in part, on proper screening. <u>See</u> <u>Integrity Staffing Sols., Inc. v. Busk</u>, 574 U.S. at 35; <u>see also</u> <u>IBP, Inc. v. Alvarez</u>, 546 U.S. at 40 (holding that the time that poultry plant workers spent waiting to don their gear was not compensable under the FLSA); <u>Whalen v. United States</u>, 93 Fed. Cl. 579, 600 (2010) (Mandatory security inspections for air traffic controllers at an Air Force Base were deemed "not integral and indispensable to their principal activities as air traffic controllers."). Although plaintiffs' second amended complaint does not offer a great deal of detail, it appears from the second amended complaint, that passing through various security steps at the Beaumont Institution could be central to plaintiffs' assigned duties, as well as after they have passed through security, as plaintiffs, for example, are expected to perform required activities as prison guards, by responding to security incidents as they arise and watching for contraband. As discussed below, one test for whether an activity is "integral and indispensable" to a principal activity is whether the employer could have eliminated the activity without negatively impacting the safety or effectiveness of those on the premises. <u>See</u> <u>Integrity Staffing Sols., Inc. v. Busk</u>, 574 U.S. at 38–39 (Sotomayor, J., concurring)

("As both Department of Labor regulations and our precedent make clear, an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively"). Although in Henderson v. Cuyahoga County, 2020 WL 5706415, the court, in an unreported opinion, wrote that the Henderson plaintiff, and similarly situated detention officers, "could still perform his job [at a medium-maximum security prison] effectively if the pre-shift screenings were eliminated," the court is not convinced at this time that the security screenings for personnel and for persons who work at a facility which houses more than 4,300 inmates, including some who are violent offenders, should be discounted. See id. at *3. The allegations in plaintiffs' second amended complaint are sufficient, at this time, to defeat defendant's motion to dismiss. Plaintiffs will be required to offer more evidence on this point to ultimately prevail.

### (2) Collecting and Donning Security Equipment

Plaintiffs' second pre-work activity claimed as compensable relates to when plaintiffs "collect and don their duty belts and other required equipment after clearing the staff screening site, including required metal chains and chits, which are essential to hold keys and access equipment." Since the adoption of the Portal-to-Portal Act, the Supreme Court has held:

> [A]ctivities, such as the donning and doffing of specialized protective gear, that are "performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded . . . ."

IBP, Inc. v. Alvarez, 546 U.S. at 30 (quoting Steiner v. Mitchell, 350 U.S. at 256). Although the FLSA explicitly does not allow compensation for "any time spent in changing clothes or washing at the beginning or end of each workday, which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee," 29 U.S.C. § 203(o), the Supreme Court has distinguished between putting on specialized protective gear and changing clothes. Sandifer v. United States Steel Corp., 571 U.S. 220, 233 (2014). The Supreme Court has noted that "dictionaries from the era of § 203(o)'s enactment indicate that 'clothes' denotes *items that are both designed and used to cover the body and are commonly regarded as articles of dress*." Sandifer v. United States Steel Corp., 571 U.S. at 227 (emphasis in original). The Supreme Court also has indicated that the definition does not necessarily exclude items designed and used to protect against workplace hazards. See id. at 228. In Sandifer, steelworkers brought a collective action against their employer, United States Steel Corporation, alleging that it failed to compensate them for "time spent donning and doffing protective gear." See id. at 224. In that case, the Supreme Court considered as clothing a flame-retardant jacket, pair of pants, and hood, a hardhat, a snood, wristlets, work gloves, leggings, and metatarsal boots. See id. at 233. By contrast, the Supreme Court stated

14

that safety glasses, earplugs, and a respirator were not considered clothes. See id.

For correctional officers, some courts have ruled that picking up specialized equipment can be related to a correctional officers' principal activity. See Aguilar v. Mgt. & Training Corp., 948 F.3d at 1283 (determining that picking up keys and chits, an individualized metal coin that records who has the equipment, is "integral and indispensable to the officers' principal activities of maintaining custody and discipline of the inmates and providing security."); see also Hootselle v. Mo. Dep't of Corrections, 624 S.W.3d at 141 (concluding that retrieving keys and radios immediately "demonstrate[s] the time spent picking up and returning equipment used in supervising, guarding, escorting, and disciplining offenders on shift is a principal activity").

Opinions issued by courts not precedential for this court have looked to whether donning and doffing gear was required by the employer or undertaken for the employer's benefit to determine whether the activities were compensable, and also have affirmed the specific nature of that inquiry. See, e.g., Chayoga v. City of Chicago, 992 F.3d 607, 622–23 (7th Cir. 2021) (holding that the time the police department's Special Weapons and Tactics (SWAT) Unit spends transporting, loading, and unloading SWAT equipment and firearms inside their homes is not compensable under the FLSA, even where the city employer requires the officers to transport their gear home with them after every shift, because those activities were not integral and indispensable to carrying out officers' principal law enforcement duties, as officers "are still able to perform their principal duties if they do not bring their equipment home but rely on other arrangements"); Llorca v. Sheriff, Collier Cnty., Fla., 893 F.3d at 1324 (stating that just because an employer requires or benefits from an activity does not render such activity compensable and finding that county deputies were not entitled to compensation for donning and doffing protective gear because "it is not 'integral' to the deputies' principal activities"); Perez v. Mountaire Farms, Inc., 650 F.3d 350 (4th Cir. 2011) (concluding that donning and doffing bump caps, ear plugs, smocks, aprons, hair and beard nets, gloves, and steel-toed boots by poultry processing plant employees, who worked "butchering and processing chickens," was compensable in part because doing so primarily benefitted the employer); Franklin v. Kellogg Co., 619 F.3d 604, 619–20 (6th Cir. 2010) (concluding that for employees at a factory that produced frozen breakfast foods, donning and doffing company-provided "pants, snap-front shirts bearing the Kellogg logo and employee's name, and slip-resistant shoes" was compensable, even though employees could perform their jobs without it, because it was required by and primarily benefitted the employer); De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 371–73 (3d Cir. 2007) (rejecting "exertion" as a test for compensability for employees at a chicken processing complex and suggesting that the correct focus was whether donning and doffing on the employer's premises is required by the employer, the law, or the nature of the job); Alvarez v. IBP, Inc., 339 F.3d 894, 902–04 (9th Cir. 2003) (concluding that donning and doffing protective gear by meat packing plant employees was compensable in part because doing so was required by and for the benefit of the employer); Reich v. IBP, Inc., 38 F.3d 1123, 1124–26 (10th Cir. 1994) (concluding that donning and doffing items such as hard hats, safety glasses, ear plugs, and safety shoes for employees "engaged in the slaughter, processing, and packing of beef and pork" did not meet the definition of "work"

in the FLSA and, although required and valuable to the employer, it was primarily for the benefit of the employees and was therefore not compensable).

Plaintiffs allege that "[o]nce Plaintiffs arrive at their posts inside the Institution, they continue to perform unpaid safety and security work as they inspect, account for, and exchange equipment—including but not limited to radios, oleoresin capsicum ('OC') spray and keys—with the outgoing correctional officer assigned to that post." Plaintiffs argue that "[r]etrieving and donning the duty belt and metal chains and chits must be performed on Defendant's premises after clearing the screening site because Plaintiffs cannot wear their duty belts and metal chains as they walk through the upright metal detector without sounding the alarm." Plaintiffs continue:

> [C]ollecting and donning security and accountability equipment on the Institution's premises is integral and indispensable to Plaintiffs' principal activity of maintaining safety and security of staff, inmates, and the Institution because these activities are intrinsic to that principal activity, and ones with which they cannot dispense if they are to safely perform their job duties as correctional officers in the dangerous prison environment.

Defendant's motion to dismiss argues that "[p]laintiffs have not included any allegations demonstrating that donning the duty belt, metal chains, and chits at this juncture is 'integral and indispensable' to the correctional officers' principal activities." Defendant argues, without support, that "plaintiffs cannot truthfully allege that the duty belts must be donned on site because plaintiffs can wear metal-free belts, which would pass through the detector." Defendant also argues because plaintiffs do not receive their equipment immediately after screening, but at their post, "plaintiffs have not demonstrated that donning the belt before then would serve any purpose—much less that it would be 'integral and indispensable' to their principal activities." Plaintiffs argue that because they do not pick up their keys until they reach their post within the Beaumont Institution, that plaintiffs should be compensated for picking up their keys and equipment, which are indeed integral and indispensable to plaintiffs' principal duties. Plaintiffs' allegations must be proven by factual inquiry, but their second amended complaint is sufficient to defeat defendant's motion to dismiss at this time. Further specific factual inquiry related to plaintiffs' allegations, along with factual proof, will be necessary for plaintiffs to ultimately prevail.

### (3) <u>Entering the Sally Port and Flipping the Accountability Chit</u>

The third pre-work activity that plaintiffs claim should be compensated, but has not been, is after plaintiffs collect and don their belts, they enter the "sally port, where they are required to flip their accountability chit signifying that they are on duty and inside the secured confines of the Institution." Plaintiffs argue that they "continue to perform unpaid security work after clearing the slider or sallyport and while walking to their 24-hour posts inside the secure confines of the Institution." Defendant, again, argues that plaintiffs have created a "conflation of 'principal activities' with abstract general purposes." According to defendant, "plaintiffs have not plausibly alleged that their flipping an accountability chit is 'integral and indispensable' to plaintiffs' principal activities." Defendant continues, "[f]or

this reason, the [Federal Labor Relations Authority] has consistently held that officers' flipping their accountability chit were not engaging in a compensable . . . activity," citing <u>FCI Bastrop & AFGE Local 3828</u>, 69 F.L.R.A. 176, 181 (Jan. 27, 2016) and <u>USP Terre Haute & AFGE Local 720</u>, 58 F.L.R.A. 327 (Jan. 28, 2003).

At issue is whether these activities are sufficiently tied to plaintiffs' principal activities as prison guards. According to plaintiffs, once inside the Beaumont Institution, they are on duty and responsible for the "safety and security" at the Beaumont Institution and for the persons inside, inmates, and staff. These early activities in the Beaumont Institution are plausibly integral and indispensable and, therefore, tied to the prison guards' principal activities for which they are hired. In <u>Hootselle</u>, the court wrote:

> [A]lthough the corrections officers are not at their posts, they are required to do the work they are employed to do – specifically, supervising offenders and, when the need arises, intervening in fights or responding to other incidents (i.e., guarding and disciplining offenders). This is the same work expected of the corrections officers during their shifts. The only difference is where within the facility they do the work, at or away from their posts. Because the corrections officers are supervising, guarding, and disciplining offenders during this time, once they are in the presence of inmates and "on duty and expected to respond" to emergent incidents, they are performing the work they are employed to do.

<u>Hootselle v. Mo. Dep't of Corrections</u>, 624 S.W.3d at 142. With regard to defendant's motion to dismiss in the above captioned case, plaintiffs should be allowed to prove if the time plaintiffs, as corrections officers, devote to clearing the sally port and flipping their accountability chits should be compensable. Further specific proof related to plaintiffs' claims will be required to ultimately prevail.

### (4) Walking to Their Assigned Post

Plaintiffs claim that they should be compensated for the time they spend walking from security to their assigned posts, during which time they are in uniform and must monitor inmate security and respond to inmates and staff security issues as they arise. When plaintiffs "walk[] to their 24-hour posts inside the secure confines of the Institution," plaintiffs say they not only go to their assigned posts but they also "supervise and monitor inmates, observe and correct inmate behavior, respond to inmate questions, check for security breaches in the perimeter fence and elsewhere inside the Institution, check for contraband, run to locations where body alarms sound, and respond to other emergencies as they arise." Plaintiffs state:

> Plaintiffs perform their principal activities of supervising and monitoring inmates and maintaining safety and security while walking to their assigned posts inside the secure confines of the Institution because, among other things, they, at all times, are in uniform, identifiable to the inmates and staff as correctional officers, and they perform patrol and security work as they

walk to their posts, remain vigilant, alert, and ready to (and do) respond to emergencies.

Defendant, however, asserts that "[b]inding authority holds that [plaintiffs' walk to their posts] is not compensable," citing IBP, Inc. v. Alvarez, 546 U.S. at 40–41; and Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. at 36. According to defendant, courts often have found that the Portal-to-Portal Act does not consider an employee's commute to and from a place of business to be compensable work time. Defendant cites to Whalen v. United States, 93 Fed. Cl. 599, in which air traffic controllers claimed that they should be compensated for the time they spent "submitting to mandatory security inspections at the entrance and exit gates of Edwards [Air Force Base]," to include time spent driving to and from security to their posts, "time spent submitting to mandatory vehicle inspections, and time involved with mandatory base gate closures." Id. at 601. A Judge of the U.S. Court of Federal Claims held that security inspections were not "necessary to ensure the safety of the skies," and were, therefore, "an extension of plaintiffs' commute." Id. at 600. As such, security inspections in Whalen were not compensable time under the Portal-to-Portal Act. See id.

Unlike the commute in Whalen, however, during which those air traffic controllers were not required to vigilantly monitor the skies, during plaintiffs' walks to their assigned posts, plaintiffs in the above captioned case "supervise and monitor inmates, observe and correct inmate behavior, respond to inmate questions, check for security breaches in the perimeter fence and elsewhere inside the Institution, check for contraband, run to locations where body alarms sound, and respond to other emergencies as they arise."[4] Defendant has not refuted factual allegations as to plaintiffs' prison guard duty obligations on their walk to their assigned posts. For the purposes of addressing defendant's motion to dismiss, plaintiffs have sufficiently stated a claim that in the course of walking to their duty stations, plaintiffs may be performing duties sufficiently tied to plaintiffs' principal activities so as to cause the court to deny defendant's motion to dismiss.

## (5) Equipment and Information Exchange at the Assigned Post

The next pre-shift activity for which plaintiffs allege they should be compensated is the equipment and information exchange, which occurs at plaintiffs' assigned posts of duty. As noted above, when plaintiffs reach their post, according to plaintiffs, they "exchange equipment—including but not limited to radios, oleoresin capsicum ('OC')

---

[4] The DoL has indicated that "the principles which apply in determining whether time spent in travel is compensable time depends on the kind of travel involved." U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #22 (July 2008). Consistent with Whalen v. United States, 93 Fed. Cl. 579, "[a]n employee who travels from home before the regular workday and returns to his/her home at the end of the workday is engaged in ordinary home to work travel, which is not work time." U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #22. The court notes, however, "[t]ime spent by an employee in travel as part of their principal activity, such as travel from job site to job site during the workday, is work time and must be counted as hours worked." U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet #22.

spray and keys—with the outgoing correctional officer assigned to that post. Plaintiffs also perform a vital (but unpaid) information exchange with the outgoing correctional officer about any significant security events that occurred the previous shift." Plaintiffs state:

> As they exchange equipment and vital, potentially life-saving, information, Plaintiffs are performing their principal activities of supervising and monitoring inmates on post . . . by ensuring accountability for keys and correctional equipment so that such items do not fall into the hands of inmates, as well as by ensuring that oncoming officers have all information necessary to maintain the safety and security of the inmates, staff and post during their shift.

Defendant argues "it is not clear that donning this gear is 'integral' or intrinsic to the correctional officers' principal activities." Defendant continues "[b]ecause only one officer (at most) needs to be supervising the inmates and one officer is being compensated during the shift-change, plaintiffs have not plausibly alleged that any officer is engaging in supervisory activities while not being compensated." It appears that defendant is arguing that, because only one officer is technically assigned "on duty" during the shift change, only the compensated officer is expected to actively monitor the Beaumont Institution and respond to security incidents, should they arise during a shift change. The court finds defendant's argument problematic, given the unrefuted allegations that while in the Beaumont Institution, prison guards are expected to assist with disturbances that occur and to monitor security in the Beaumont Institution, which houses over 4,300 inmates, some of whom are confined to a high security penitentiary. Moreover, during this time plaintiffs are working, by direction and with knowledge of defendant. The allegation that the time spent by plaintiffs exchanging information and equipment at plaintiffs' guard post is plausible as "integral and indispensable" to plaintiffs' principal activities during their employment. Defendant's motion in this regard should be denied at this time, and plaintiffs should be allowed the opportunity to present additional factual information.

### (6) Walking from Their Assigned Post After Shifts

Plaintiffs claim the sixth activity for which they should be compensated is after their assigned shifts, when they are "walking from their posts to exit the secured perimeter" after the information exchange after completion of their shift and on their way out of the Institution. During this walk, plaintiffs claim they are "are required to, and do, respond to emergencies, including violent fights between inmates, within the Institution on unpaid time when such emergencies occur while they are walking to their posts prior to their shifts, or while they are walking from their posts back to the Control Center after their shifts." Plaintiffs allege that "[f]ailure to respond to an emergency results in discipline up to and including termination." Just as when plaintiffs walk to their post after flipping their accountability chits, when walking to the exit, plaintiffs are still required to perform many of their assigned duties such as responding to emergencies and checking for contraband and security breaches. Like when plaintiffs walk to their post, these activities are plausible, compensable activities under the FLSA and sufficiently tied to plaintiffs' principal activity for which they are hired. Defendant's motion to dismiss for failure to state

a claim in this regard should be dismissed.

**The De Minimis Rule**

The FLSA implementing regulation at 5 C.F.R. § 551.412(a)(1) states:

> If an agency reasonably determines that a preparatory or concluding activity is closely related to an employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per workday, the agency shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

The DoL regulations regarding the de minimis doctrine also provide that "insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis." 29 C.F.R. § 785.47 (2020) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. at 680). Despite the foregoing, "[a]n employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he [or she] is regularly required to spend on duties assigned to him [or her]." Id.

In filings in this court, defendant argues that for plaintiffs' FLSA claim to survive this motion to dismiss, plaintiffs must plausibly allege that their pre- and post-shift activities are both "integral and indispensable to their principal activities and that the time they spent performing any such compensable work per day is greater than the 10-minute de minimis threshold." Defendant asserts:

> The regulations require an agency to credit time spent in preparatory or concluding activities as work only if the "agency reasonably determines that [such] activity is closely related to an employee's principal activities, and is *indispensable to the performance of the principal activities, and* that the total time spent in the activity is *more than 10 minutes per workday* . . . ." 5 C.F.R. § 551.412(a)(1); *accord* 5 C.F.R. § 550.112(b)(1)(i).

(emphasis and alterations in original).

Defendant notes that "precedent holding that the *de minimis* rule applies 'even in the context of preshift or postshift activities that regularly recur,'" quoting Riggs v. United States, 21 Cl. Ct. 664, 682 (1990). Moreover, defendant argues that the "regularity" of the activities depends largely on the duration "required for their performance," and that, "it would be implausible for the duration of the information exchange to not fluctuate with the amount of information that needs to be conveyed about 'the previous shift.'" Therefore, defendant argues that plaintiffs' failure to parse out the amount of time required for the individual activities alleged as eligible for compensation is fatal to their case.

20

Plaintiffs assert that "[d]efendant entirely misinterprets and misapplies the *de minimis* rule." Plaintiffs continue, "DoL has stated that the *de minimis* rule 'applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes of duration, and where the failure to count such time is due to considerations justified by industrial realities.'" Plaintiffs state that they "have explicitly alleged that their pre- and post-shift activities take longer than 10 minutes on a daily (i.e., regular and recurring) basis and that this time is administratively feasible to record." Therefore, according to plaintiffs, the activities exceed the de minimis threshold, and, as a result, should be compensable.

Under the continuous workday rule, the workday encompasses "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F.R. § 790.6(b). If the court were to find some or all of plaintiffs' pre- and post-shift activities alleged in plaintiffs' second amended complaint to be a compensable under the FLSA, then all activities performed during the "workday" as defined by 29 C.F.R. § 790.6(b), would be compensable, regardless of whether each activity had an individual basis for compensability. See 29 C.F.R. § 790.6(b); see also IBP v. Inc. v. Alvarez, 546 U.S. at 29 (stating that following the Supreme Court's "prior decisions interpreting the FLSA, the Department of Labor has adopted the continuous workday rule"); Aguilar v. Mgt. & Training Corp., 948 F.3d at 1279 (quoting Castaneda v. JBS USA, LLC, 819 F.3d 1237, 1243 (10th Cir. 2016) (citing 29 C.F.R. § 790.6(a)); see also Hootselle v. Mo. Dep't of Corrections, 624 S.W.3d at 128 ("Under the continuous workday rule, all preshift and postshift activities after the first and before the last principal activity of either retrieving or returning keys and radios or supervising inmates are also compensable.").

The United States Court of Appeals for the Federal Circuit has adopted factors articulated by the United States Court of Appeals for the Ninth Circuit, stating that

> [t]he factors that trial courts must examine when assessing whether the work underlying a compensation claim is *de minimis* were properly set forth in *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984), which suggested analysis of "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work."

Bobo v. United States, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (quoting Lindow v. United States, 738 F.2d at 1063; see also Easter v. United States, 575 F.3d 1332 (Fed. Cir. 2009); Adams v. United States, 471 F.3d 1321, 1327 (Fed. Cir. 2006). Plaintiffs allege that their pleadings and the circumstances of their case, as analyzed under the Lindow factors, "are clearly sufficient to state a claim under the FLSA." Defendant argues, however, that the Lindow factors do not apply to the case currently before the court because plaintiffs have failed to meet the "burden of establishing that their compensable activities 'require[] more than a de minimis amount of time.'" (quoting Akpeneye v. United States, 146 Fed. Cl. 356, 365 (2019)). Defendant continues, quoting Carlsen v. United States, 521 F.3d 1371, 1380–81 (Fed. Cir.), as corrected on reh'g (Fed. Cir. 2008), that because "the Lindow factors only appl[y] to 'amounts greater than 10 minutes,'" the

Lindow factors should not be applied to plaintiffs' case.[5] (alteration added). Defendant asserts, however, that even under the Lindow test, "plaintiffs have still not alleged facts establishing that their compensable activities are more than *de minimis*."

Under the first Lindow factor, plaintiffs argue that there is no practical or administrative difficulty in recording the additional time worked. Rather, plaintiffs allege that had the Beaumont Institution "implemented time clocks where Plaintiffs perform their first principal activity (i.e., at the screening site location) and where Plaintiffs perform their last principal activity (i.e., where Plaintiffs exit the secure perimeter of the Institution), the unpaid work at issue in this case would have been recorded." Plaintiffs assert that the Beaumont Institution's failure to place the time keeping clocks in locations that would properly capture plaintiffs' compensable time was entirely discretionary, and it would not be overly burdensome on the Beaumont Institution to install time clocks that would accurately capture all of plaintiffs' claimed activities. As such, plaintiffs argue that their claims satisfy the first prong of the Lindow test because the administrative burden on the Beaumont Institution is low. Defendant argues that plaintiffs' proposed approach of placing time clocks near the entrance of the facility is only necessary "if the defendant were required to compensate plaintiffs for *all* of the alleged pre-shift and post-shift activities, including the officers' non-compensable walk to the exit of the [I]nstitution after relinquishing their equipment and keys . . . ." (emphasis in original). Defendant reasons, therefore, that "unless the Court concludes that *all of the alleged activities* are compensable, plaintiffs have not articulated a practical or feasible way to record compensable time—especially in light of activities like the exchange, which will fluctuate from day to day and post to post." (emphasis in original). In the motion to dismiss, defendant, however, has not argued that it would be impossible to record the time.

Under the second Lindow factor, plaintiffs have alleged that the claimed uncompensated activities take 15 to 30 minutes per shift. Viewed over the course of the three-year recovery period, the amount of uncompensated time, plaintiffs allege, amounts to an average of 22.5 minutes per day for a total of 292 hours of unpaid time per plaintiff. Defendant suggests that because "plaintiffs argue that their compensable time must be tallied 'over the course of the three-year recovery period' for the purposes of the *de minimis* doctrine," and, defendant states, because "no authority we are aware of, including plaintiff's [sic] cited cases, supports that proposition," that plaintiffs' arguments do not

---

[5] Defendant further asserts that activities that take longer than 10 minutes may still be de minimis, and the court need only

> look at the other *Lindow* factors when addressing whether compensable activities taking *longer* than the 10-minute threshold are *de minimis*. *See, e.g.*, *Akpeneye II*, 146 Fed. Cl. at 365 ("Indeed, activities that require *even more time* can still be de minimis depending on 'the practical administrative difficulty of recording additional time, the aggregate amount of compensable time, and the regularity of the work.'") (quoting *Carlsen*, 521 F.3d at 1380).

(emphasis in original).

satisfy the second <u>Lindow</u> factor. Plaintiffs' allegations, if proven correct, may satisfy the regulation at 5 C.F.R. § 551.412(a)(1), which requires compensation for activities that are integral and indispensable to the principal activities and which exceed 10 minutes per day. Moreover, because plaintiffs allege that the amount of time alleged exceeds 10 minutes daily, and defendant has not refuted that allegation, plaintiffs' allegations could satisfy the second <u>Lindow</u> factor, which requires that the amount of time at issue is substantial especially in the aggregate. <u>See</u> <u>Lindow v. United States</u>, 738 F.2d at 1063 (recognizing that other courts had granted relief on claims that were minimal daily, but substantial in the aggregate over time). The Tenth Circuit's approach in <u>Reich v. Monfort</u>, also is instructive. <u>See</u> <u>Reich v. Monfort</u>, 144 F.3d 1329 (10th Cir. 1998). In <u>Reich</u>, the United States Court of Appeals for the Tenth Circuit interpreted the <u>Lindow</u> factors to require courts to identify the amount of daily time involved before evaluating whether that time is <u>de</u> <u>minimis</u>. <u>See</u> <u>Reich v. Monfort</u>, 144 F.3d at 1334. The <u>Reich</u> court ultimately concluded that donning and doffing safety gear was not <u>de</u> <u>minimis</u> because 10 minutes per day was sufficiently regular to weigh in favor of compensability. <u>See</u> <u>id.</u>

Regarding the third <u>Lindow</u> factor, which looks to the regularity of the uncompensated activities, plaintiffs allege that their uncompensated activities occur with sufficient regularity to assist plaintiffs to survive a motion to dismiss. To satisfy the third <u>Lindow</u> factor, the activities at issue must occur frequently and regularly, rather than on an ad hoc basis. <u>See</u> <u>Lindow v. United States</u>, 738 F.2d at 1062–64. In <u>Lindow</u>, the court found that the 5 to 15 minutes employees spent once or twice per month relieving an operator shift change was <u>de</u> <u>minimis</u> because the aggregate time was insignificant, the practice was irregular, and the ad hoc nature of the duty posed administrative difficulties for recording the time. <u>See</u> <u>id.</u> By contrast, in the case currently before the court, plaintiffs have alleged that these pre- and post-shift activities are required every time plaintiffs are assigned to a 24-hour post. Plaintiffs argue that this satisfies the threshold for "regular and recurring." Plaintiffs indicate that: "[m]ost of the posts are staffed for 16 or 24 hours per day, although some are staffed for only 8 hours per day." Plaintiffs continue that

> [w]hen a post is staffed for 24 hours per day, the Defendant assigns a correctional officer to that post for a scheduled paid shift of 8 hours. For a 24-hour post, there are three 8-hour paid shifts daily, often referred to as Morning Watch, Day Watch and Evening Watch. There is no overlap of these 8-hour shifts on 24-hour posts.

(footnote omitted). Plaintiffs also state that "[b]ecause the Institution has implemented a Compressed Work Schedule option, some 24-hour Housing Unit posts are staffed with two shifts of 12 hours, instead of three shifts of 8 hours. There is no overlap on the 12-hour shifts on 24-hour Housing Unit posts." By contrast, plaintiffs have stated that there is "a 15-minute scheduled, paid overlap between the two 8 hour shifts on 16-hour posts in the Institution since at least 2014." Although questions remain regarding how often and how much time plaintiffs spend on some of the alleged uncompensated activities at each of the 24-hour posts, plaintiffs' allegations are sufficient to survive defendant's motion to dismiss. Further evidence is required to establish if these 24-hour posts predominate throughout the Beaumont Institution, and how often they are staffed in three shifts of 8

hours or two shifts of 12 hours, as well as their impact on calculating damages if plaintiffs prevail on liability. To survive defendant's motion to dismiss, plaintiffs need only allege unrefuted facts which plausibly entitle them to relief, and the court is required to accept as true all factual allegations set forth in the second amended complaint. See, e.g., Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016). Plaintiffs' allegations in their second amended complaint of more than de minimis compensable activity is sufficient to survive defendant's motion to dismiss. Whether each of the six activities plaintiffs claim are compensable and whether the aggregate time spent will exceed the de minimis standard remains for further consideration by the court.

**Plaintiffs' Claim for Interest on Backpay**

In their second amended complaint, plaintiffs also claim they should be "entitled to recover interest on their backpay damages for Defendant's failure to pay them overtime compensation" under the Back Pay Act, 5 U.S.C. § 5596. Defendant does not challenge the general applicability of the of the Back Pay Act for FLSA claims. "The Back Pay Act is not itself a jurisdictional statute. It is merely derivative in application, depending on a prior finding of appropriate jurisdiction in the Claims Court." Mitchell v. United States, 930 F.2d 893, 897 n.3 (Fed. Cir. 1991) (citing United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir. 1983); and Shelleman v. United States, 9 Cl. Ct. 452 (1986)). Absent some other money-mandating source of law, the Back Pay Act is inapplicable for plaintiffs. See Spagnola v. Stockman, 732 F.2d 908, 912 (Fed. Cir. 1984). In the case currently before the court, the FLSA provides the necessary money mandating source of law. See Astor v. United States, 79 Fed. Cl. 303, 319 (2007) ("The BPA includes a waiver of sovereign immunity as to interest on awards under the Act" provided that plaintiffs have (1) been affected by an unjust or unwarranted personnel action, (2) suffered a withdrawal or reduction of all of part of their pay, and (3) but for the action, plaintiffs would not have experienced the withdrawal or reduction). Defendant argues that "plaintiffs' right to relief under the Backpay Act fails because plaintiffs' FLSA claims do not survive." Plaintiffs assert, citing to Adams v. United States, 48 Fed. Cl. 602, 604–11 (2001), that "because Plaintiffs have stated a claim under the FLSA for unpaid overtime," "the Back Pay Act is similarly applicable, and jurisdiction is proper." Plaintiffs' claims are sufficient to defeat defendant's motion to dismiss at this time. The FLSA provides a necessary money mandating source of law to support a claim for interest but consideration of the issue depends on whether plaintiffs prevail on liability.

**C O N C L U S I O N**

Each of the activities asserted as compensable by plaintiffs in this case must be analyzed after fact intensive inquiry. The ultimate outcome as to each alleged compensable activity is not decided at this time. Plaintiffs have raised sufficient, unrefuted allegations and have stated sufficient claims to defeat defendant's motion to dismiss. Further evidence also will be required to assess whether or not the totality of the claimed pre- and post-shift activities which plaintiffs perform during the course of assigned time passes the de minimis test. Defendant's allegations in its motion to dismiss and reply are insufficient to defeat plaintiffs' claims at this stage of the proceedings. For the reasons

stated above, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is **DENIED**. Further proceedings will be scheduled by separate Order.

      **IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**